# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# CHARLESTON DIVISION

| | |
|---|---|
| Mother Doe 203, on her own behalf and on behalf of her minor child, Jane Doe 203, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| Berkeley County School District, | ) ) |
| Defendant. | ) ) ) |

C.A. No.: 2:14-cv-3575-PMD

**ORDER**

This matter is before the Court on Defendant Berkeley County School District's summary judgment motion (ECF No. 38). For the reasons stated herein, the Court grants the District's motion in part, declines to rule on the remainder of it, and remands this case to state court.

## BACKGROUND

Jane Doe 203 received her middle school education at Marrington Middle School in Goose Creek, South Carolina. This case arises out the conduct of Jane Doe's classmate, WW, who sexually harassed her several times at school in 2013.

The harassment began early that year, when Jane Doe and WW were sixth graders. The two socialized at school and, for a time, had a "sixth-grade level relationship." (Pl.'s Mem. Opp'n Def.'s Mot. Summ. J., Ex., Tr. of Jane Doe 203 Dep., ECF No. 47-20, at 40). Sadly, WW made the relationship an abusive one. WW would sit next to her at lunch, touch her inappropriately, and make her touch him inappropriately. Whenever she resisted, he threatened to spread rumors that she was promiscuous.

No school employee observed WW's conduct, and Jane Doe initially did not report it to anyone at the school. However, after two or three weeks of WW's abuse, she told her Mother. On February 19, 2013, Mother went to the school with Jane Doe, where they reported the abuse to principal James Spencer and guidance counselor Kevin Crawford. Spencer told Jane Doe that the matter would be handled. Jane Doe then continued speaking with Crawford, who asked her to write a statement explaining what WW had done to her. Jane Doe did so and included in her statement the names of students who she believed witnessed the abuse. This was the first time the school had received a report of WW engaging in inappropriate sexual behavior.[1]

After Jane Doe finished writing her statement, Crawford gave it to assistant principal Carol Fowler. Fowler reviewed the statement and then spoke with Jane Doe. Fowler then questioned WW, who denied Jane Doe's accusations. Like Jane Doe, WW gave Fowler the names of several student witnesses to interview. Fowler spoke with the students Jane Doe and WW named. None of them said they saw WW and Jane Doe engage in inappropriate touching. Fowler called Mother to tell her that a sexual harassment form was being sent home for Jane Doe and Mother to complete together. Fowler followed up with Jane Doe several times about the form, but it was never returned to the school. After Fowler did not hear anything else from Mother or Jane Doe on the matter for some time, she took no further investigative action. Nevertheless, school officials directed WW to stay away from Jane Doe.

After that, WW left Jane Doe alone until May, when he kissed her one time without her consent. Jane Doe did not report that incident. However, on May 20, another female student, S, reported to Fowler that WW grabbed her in the library and said something lewd to her. Fowler investigated the complaint over the next day by interviewing other students who were present

_____

1. In her statement to Crawford, Jane Doe wrote that WW had harassed other girls before but had "never been found out" by the school. (Pl.'s Mem. Opp'n Def.'s Mot. Summ. J., Ex., Jane Doe 203 statement dated Feb. 19, 2013, ECF No. 47-1, at 1).

during the incident.  At least two other girls (none of whom were Jane Doe) told Fowler that they had overheard WW's comments to S and that WW had also made inappropriate sexual comments to them.[2]  By the end of May 21, Fowler suspended WW from school for at least one day.  The record indicates this was WW's last incident during the 2012–2013 school year.

In fall 2013, Jane Doe and WW were assigned to only one class together.  They had little interaction, and no incidents, until Monday, October 7, when WW approached Jane Doe in class and made sexually suggestive gestures at her.  The teacher of that class was present but did not see the incident, as she was assisting other students.  Jane did not report the offense to her Mother or to any school employee.

The following morning, WW touched three girls inappropriately.  The first two incidents occurred together.  WW groped Jane Doe in the presence of her female friend, EB.  When EB intervened, WW grabbed and fondled EB.  Jane Doe and EB then ran away from WW.  Neither of them reported the attack to school personnel.  The third incident occurred later that morning, when WW inappropriately touched a third girl, AC.[3]  AC reported that incident to Spencer around 11:30 a.m. Under questioning, WW admitted to "dancing" in AC's personal space.  The school's administration then interviewed three of AC's classmates about the incident.  All three students confirmed AC's accusations.  Spencer then reviewed WW's disciplinary record and suspended WW from school for the rest of the week.

On October 9, Spencer, Crawford, and another school administrator met to discuss WW. They agreed to recommend that the District expel WW.  Spencer then called District administrators to schedule an expulsion hearing and to request permission to extend WW's suspension up through the date of the hearing.  The District set the hearing for October 17.

---

2.   Prior to their interviews, none of those girls had complained to school personnel about WW's behavior.

3.   According to AC, WW also touched her inappropriately on either October 1 or 3.  However, she did not report that incident until October 14.

3

Initially, neither Jane Doe nor EB told their parents about WW's October 7 and 8 assaults. However, after school on October 9, EB told her parents what WW did to her and to Jane Doe. EB's father discussed the matter with Jane Doe's Mother, who then asked Jane Doe about it that evening. Jane Doe told Mother what WW had done to her that week. The next morning, Mother and EB's father went to the school and relayed to Spencer what their daughters had told them the previous evening. A school resource officer then interviewed Jane Doe and EB and obtained written statements from them. Because WW had already been suspended and slated for expulsion, the school did not take any further disciplinary action for what he did to Jane Doe and EB that week.

The District expelled WW after the October 17 hearing.

## PROCEDURAL HISTORY

In 2014, Mother sued the District and Spencer in state court. She asserted a claim against the District for violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, and as well as state-law claims for gross negligence and loss of services. She also asserted a claim against Spencer for violation of 42 U.S.C. § 1983.

The District and Spencer removed the case to this Court and then filed an answer. Thereafter, Spencer moved for judgment on the pleadings. This Court granted the motion and dismissed Spencer from the case in October 2015. After the remaining parties conducted discovery, the District moved for summary judgment. Mother filed a response, and then the District filed a reply. Accordingly, this matter is now ripe for consideration.

## LEGAL STANDARD

To grant a motion for summary judgment, a court must find that "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). The court is not to weigh the evidence

4

but rather must determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). It must view all evidence in the light most favorable to the non-moving party. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990). That party has the "burden to persuade [the court] that there is indeed a dispute of material fact. It must provide more than a scintilla of evidence—and not merely conclusory allegations or speculation—upon which a jury could properly find in its favor." *CoreTel Va., LLC v. Verizon Va., LLC*, 752 F.3d 364, 370 (4th Cir. 2014) (citations omitted). Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual basis." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, . . . summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991).

## DISCUSSION

The District contends it is entitled to summary judgment on all of Mother's claims. Mother counters that all her claims are viable for trial. For the following reasons, the Court concludes that the District is entitled to summary judgment on the Title IX claim and that the remaining claims, which all involve South Carolina law, are best resolved in state court.

### I.     Title IX Claim

Title IX provides, in pertinent part, that "[n]o person in the United States shall, on the basis of sex, . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX allows individuals to recover damages for certain harms caused by funding recipients' misconduct.[4] *Davis ex rel. LaShonda*

---

4.    The District admits it receives federal funding.

*D. v. Monroe Cty. Bd. of Educ.*, 529 U.S. 629, 640, 641 (1999).  Actionable misconduct includes, *inter alia*, responding to known student-on-student harassment with deliberate indifference, *id.* at 651, and retaliating against people for complaining of sex-based discrimination, *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005).  Mother has asserted both of those theories.  The Court addresses each *seriatim*.

### A.    Deliberate Indifference

The Supreme Court's decision in *Davis* "set the legal standard for Title IX claims involving student-on-student sexual harassment."  *Doe v. Erskine Coll.*, No. 8:04-cv-23001-RBH, 2006 WL 1473853, at *8 (D.S.C. May 25, 2006).  In *Davis*, the Supreme Court stated that such harassment, "if sufficiently severe," can constitute the sex-based discrimination that Title IX prohibits.  526 U.S. at 650.  Importantly, however, the Supreme Court stressed that Title IX does not impute liability to schools for their students' sexual harassment.  *See id.* at 642; *see also S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cty.*, 819 F.3d 69, 76 (4th Cir. 2016) (stating that under *Davis*, "a school may not be held liable under Title IX . . . for what its students do").  Instead, schools are liable only for their "own misconduct" in responding to the harassment—that is, for making "an official decision . . . not to remedy" the harassment after actually learning of it.  *Davis*, 526 U.S. at 642.

Moreover, the mere fact that the school failed to discover or eliminate the harassment will not create liability.  *S.B.*, 819 F.3d at 77; *see also Doe v. Bd. of Educ.*, 605 F. App'x 159, 167 (4th Cir. 2015) (per curiam) ("To avoid liability, the institution is not required 'to remedy peer harassment' or 'to ensure that students conform their conduct to certain rules.'" (quoting *Davis*, 526 at 648–49)).  Even a negligent failure to discover or remedy the harassment will not do.  *See Davis*, 526 U.S. at 642, 649.  Schools can be liable only when they actually know of the abuse and then react with "deliberate indifference," which *Davis* describes as a response, or lack

6

thereof, that is "clearly unreasonable in light of known circumstances." *Id.* at 648. In appropriate cases, courts are free to hold that a school's response was "not 'clearly unreasonable' as a matter of law" and grant summary judgment on that basis. *Id.* at 649.

After carefully reviewing the record in the light most favoring Mother, the Court concludes this is one of those cases. Each time the school received a report of abuse involving WW, it promptly investigated the complaint and took action against WW. In February 2013, even after Fowler was unable to uncover any information to corroborate Jane Doe's complaint and Mother did not return the sexual harassment form, school officials told WW to stay away from Jane Doe. After that, WW did not harass her again for several months. In May, Fowler suspended WW shortly after several female students told her that WW had made inappropriate sexual comments. Finally, WW was removed from school within a day of his October 8 harassment of AC; within two days, he was headed for expulsion. No reasonable jury could construe the school's responses as a "knowing refusal to take any action" in the face of identified misconduct. *See Davis*, 526 U.S. at 651; *see also Biggs v. Bd. of Educ. of Cecil Cty.*, 229 F. Supp. 2d 437, 445 (D. Md. 2002) (finding no *Davis* deliberate indifference where "each and every time Ms. Biggs complained, the school took action").

To be sure, the school apparently did not take any action against WW for kissing Jane Doe in May or abusing her in October. However, because Jane Doe never reported the unwanted kiss, the school never knew about it, and *Davis* forecloses liability where there is no actual knowledge of the abuse. *See* 526 U.S. at 642. Additionally, by the time the school learned about her October abuses, it had already removed WW from the school and initiated proceedings to ensure he could not return. Under those circumstances, it was "not 'clearly unreasonable' as a matter of law" for the school to take no further action against WW. *See id.* at 649

The Court also recognizes that, had the school responded differently to Jane Doe's February 2013 complaint, she and others might have been spared from some of WW's later abuses. However, courts must "refrain from second-guessing" school administrators' disciplinary decisions. *Davis*, 526 U.S. at 648 (citing *New Jersey v. T.L.O.*, 469 U.S. 325, 342–43 n.9 (1985)).

The Court laments the harm WW visited upon Jane Doe and, apparently, other girls. However, Title IX requires the Court to focus on the school's conduct, not on what WW did, and "*Davis* sets the bar high for [establishing] deliberate indifference." *S.B.*, 819 F.3d at 76; *see also Davis*, 526 U.S. at 642 (describing deliberate indifference as a "high standard"). No reasonable jury could conclude the evidence in the record surmounts that high bar. There simply is no "decision to remain idle" on this record—no "official decision by [the school] not to remedy" known student-on-student harassment. *See Davis*, 526 U.S. at 641–42. Accordingly, the District is entitled to summary judgment on Mother's deliberate-indifference claim.[5]

### B.    Retaliation

In her brief in opposition to the District's motion, Mother alleges that after she filed this lawsuit, Spencer took retaliatory actions against Jane Doe. However, as the District points out, Mother has never amended or supplemented her complaint to include a retaliation theory or the post-filing incident. The District objects to Mother attempting to constructively amend her complaint after discovery has ended and the deadline for amending pleadings has passed. The Court agrees that it is inappropriate to consider Mother's retaliation claim at this late juncture,

---

5.   To recover on a deliberate-indifference claim, a plaintiff must also show, *inter alia*, that the student-on-student harassment is "so severe, pervasive, and objectively offensive that it can be said to deprive the victim[] of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650. In addition to arguing that it was not deliberately indifferent, the District contends Mother has failed to create a genuine issue of fact as to that other requirement. Because this Court's decision on the lack of deliberate indifference is dispositive, the Court does not address that argument.

and so it declines to do so. *See Harris v. Reston Hosp. Center, LLC*, 523 F. App'x 938, 946 (4th Cir. 2013) (per curiam) (affirming district court's refusal to consider a new legal argument plaintiff raised at the summary judgment stage because "asserting a new legal theory for the first time in opposing summary judgment amounted to constructive amendment of the amended complaint and thus unfairly prejudiced the defendant"); *United States ex rel. DRC, Inc. v. Custer Battles, LLC*, 472 F. Supp. 2d 787, 795–96 (E.D. Va. 2007) (declining to analyze new theory that plaintiffs first asserted in opposition to summary judgment motion, as doing so "after the close of discovery . . . would seriously undermine the fairness of the litigation and unfairly prejudice the defendants"), *aff'd*, 562 F.3d 295 (4th Cir. 2009).

## II.     Remaining Claims

Mother's § 1983 claim against Spencer and her Title IX claim against the District provided the jurisdictional footholds the defense needed to remove this case to federal court. *See* 28 U.S.C. §§ 1331, 1343. Because the parties are not citizens of different states, *see* 28 U.S.C. § 1332(a)(1), this Court had no independent jurisdiction over Mother's state-law claims. However, this Court's supplemental jurisdiction allowed them to tag along. *See* 28 U.S.C. § 1367(a).

Having dismissed all of Mother's federal claims, the Court "may decline to exercise supplemental jurisdiction" over the state-law claims. 28 U.S.C. § 1367(c)(3); *see also Clinton v. Cty. of York*, 893 F. Supp. 581, 588 (D.S.C. 1995) ("[T]he court has discretion whether or not to exercise jurisdiction over pendent state-law claims once it has dismissed the federal claims to which the state-law claims had attached."). In *United Mine Workers v. Gibbs*, the Supreme Court stated:

> [P]endent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its jurisdiction lies in considerations of judicial economy, convenience and fairness

9

> to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them. Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

383 U.S. 715, 726 (1966). "Thus, the court should weigh the interests of comity and federalism to determine 'the most appropriate course of action.'" *Doe v. Georgetown Cty. Sch. Dist.*, No. 2:14-CV-01873-DCN, 2015 WL 5923610, at *9 (D.S.C. Oct. 9, 2015) (quoting *Clinton*, 893 F. Supp. at 588)).

This matter began in state court. With no federal issues remaining, it should return there. The remaining claims all involve issues of South Carolina law, some of which the state's courts apparently may not have settled yet. Thus, state court is the most appropriate forum to adjudicate Mother's remaining claims. The Court will remand this case to state court.

## CONCLUSION

Therefore, for the foregoing reasons, it is **ORDERED** that the Berkeley County School District's summary judgment motion is **GRANTED IN PART**, in that Mother's Title IX claim is **DISMISSED**. The Court declines to rule on the remaining portions of the District's motion.

It is **FURTHER ORDERED** that this case is **REMANDED** to the Court of Common Pleas for Berkeley County, South Carolina.

**AND IT IS SO ORDERED.**

_____
PATRICK MICHAEL DUFFY
United States District Judge

**November 9, 2016**
**Charleston, South Carolina**